UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| CELLCO PARTNERSHIP d/b/a VERIZON WIRELESS,<br><br>              Plaintiff,<br><br>v.<br><br>CITY OF MILWAUKEE; and JERREL KRUSCHKE, in his official capacity as COMMISSIONER OF PUBLIC WORKS<br><br>              Defendants. | Case No.: 23-cv-1581 |

**COMPLAINT**

The plaintiff, by its attorneys, Husch Blackwell LLP, for its Complaint against the defendants, alleges:

## NATURE OF THE MATTER

1. This action seeks relief from Defendants' unlawful denials of Plaintiff's applications for permits to install three small wireless facilities within the Deer District in the City of Milwaukee.

2. Defendants' denials violate the federal Telecommunications Act of 1996: they were not based on substantial evidence in the record and constitute effective prohibition of personal wireless service.

3. Defendants' denials also violate Wisconsin state law because they were arbitrary, unreasonable, contrary to law, and unsupported by substantial evidence.

4. Plaintiff seeks declaratory, injunctive, and mandamus relief—including on a preliminary basis—and requests that Defendants be ordered to approve Plaintiff's applications and grant all necessary permits for installation of the proposed facilities.

## PARTIES

5. Plaintiff Cellco Partnership d/b/a Verizon Wireless ("Verizon"), is a Delaware partnership authorized to do business in the State of Wisconsin, with a business address of 1 Verizon Way, Basking Ridge, NJ 07920.

6. Defendant City of Milwaukee, Wisconsin ("City") is a municipal corporation existing under the laws of the State of Wisconsin with an address of 200 East Wells Street, Milwaukee, WI 53202. Particularly relevant here is the City's

Department of Public Works, which has an address of 841 North Broadway, Room 501, Milwaukee, WI 53202

7. Defendant Jerrel Kruschke is the Commissioner of Public Works of the City of Milwaukee. He is sued in his official capacity. His address is 841 North Broadway, Room 501, Milwaukee, WI 53202.

## JURISDICTION AND VENUE

8. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1331 because it concerns federal questions arising under the Telecommunications Act, 47 U.S.C. § 151 et seq., and specifically 47 U.S.C. § 332(c). This Court has supplemental jurisdiction over the state-law claim under 28 U.S.C. § 1367 because the claim is part of the same case or controversy as the federal questions before the Court.

9. This Court has personal jurisdiction over Defendants because they are governmental bodies and officers located in the State of Wisconsin.

10. Venue is proper pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to this action occurred in Milwaukee County, Wisconsin, which is located in this judicial district and division.

## REQUEST FOR EXPEDITED REVIEW

11. Verizon requests expedited review of this action under 47 U.S.C. § 332(c)(7)(B)(v), which provides that "court[s] shall hear and decide [actions under the TCA] on an expedited basis."

## FACTUAL BACKGROUND

### A. Background on wireless communications infrastructure, including "small cells"

12. Federally licensed wireless communications carriers like Verizon work to provide commercial mobile radio services, personal and advanced wireless services, and other telecommunications services, as those terms are defined under federal law, including in the City.

13. Unlike cellular services using analog-based systems, digital technology converts voice or data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. This allows wireless communications carriers to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data and imaging capabilities as well as voice mail, call forwarding and call waiting.

14. Wireless devices utilizing all digital technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet, or base station. The base station is connected by microwave, fiber optic cable, or ordinary telephone wire to a base station controller, which subsequently routes calls throughout the world.

15. To provide reliable service to a user, coverage from cell sites must overlap in a grid pattern resembling a honeycomb. If a wireless communications carrier cannot construct a cell site or sites within a specific geographic area, it will not be able to provide service to its consumers within that area.

16. Engineers from the wireless communications carriers use sophisticated, established industry standard computer programs and extensive field testing to complete a propagation study, which shows where cell sites need to be located to provide and enhance service. The propagation study also considers the topography of the land, the coverage boundaries of neighboring cell sites, and other factors. For a wireless network to perform well, cell sites must be located, constructed, and operated so reliable coverage can be achieved. Only when the entire wireless network is operational will a mobile user have reliable service and uninterrupted communications throughout a given territory. If a carrier does not have enough functioning cell sites within a given geographic area, the mobile wireless service in that area will be insufficient to support the carrier's customers located within that area, and mobile customers who travel into that area will experience an unacceptable level of mobile wireless service.

17. Small wireless facilities—known as "small cells"—are short range mobile cell sites that are typically located on utility or light poles. Small cells are used to complement larger macro cell sites, which are usually located on towers or rooftops. Compared to macro sites, which are typically over 100 feet tall, small cells are shorter and less intrusive. They consist of antennae roughly two to three feet tall and equipment boxes approximately three cubic feet in volume. Small cells can be located on existing utility poles or on standalone poles that look like existing utility poles.

18. Examples of small cells located on poles in urban areas appear below:

 

19.     Verizon uses small cells to enhance network capacity in high traffic areas and dense urban areas. Small cells provide additional capacity for the transmission of wireless data, which improves coverage, voice quality, reliability, and data speeds for local residents, businesses, first responders, and visitors using the Verizon network. As the FCC has recognized, the need and demand for small cells is great: "To support advanced 4G or 5G offerings, providers must build out small cells at a faster pace and at a far greater density of deployment than before." FCC Order ¶ 3.

**B.     Federal and state law promote wireless infrastructure deployment.**

20.     In 1996, Congress enacted the Telecommunications Act "to encourage the rapid deployment of new telecommunications technologies." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 115 (2005) (quoting Preamble, Telecommunications Act of 1996, P.L. 104-104, 100 Stat. 56 (1996)). To that end, the Act contains various

provisions for the "reduction of the impediments imposed by local governments upon the installation of facilities for wireless communications." *Id. See generally* 47 U.S.C. §§ 253, 332.

21. The Telecommunications Act establishes a national policy to "make available, so far as possible, to all people of the Unites States, without discrimination . . . a rapid, efficient, nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of national defense, [and] for the purpose of promoting safety of life and property through the use of wire and radio communications." 47 U.S.C. § 151.

22. More recently, the Wisconsin Legislature enacted a similar law restricting local control over wireless-infrastructure installation. *See* Wis. Stat. § 66.0414.

23. Both laws apply to the latest wireless technology: small wireless facilities, or "small cells." *See id.*; *accord In the Matter of Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 F.C.C. Rcd. 9088 (2018) (FCC Order).

### C. Small cells are needed in the Deer District area—in general, and especially for the 2024 Republican National Convention.

24. The City of Milwaukee will host the 2024 Republican National Convention from July 15–18, 2024. Bill Glauber, *Republican Convention in Milwaukee to be Held July 15-18, 2024*, Milwaukee J. Sentinel (Dec. 21, 2022), https://bit.ly/46iEWtO.

25. The Convention's main programming will take place at the Fiserv Forum and in the surrounding area known as the Deer District. *Id.*

26. The Convention is expected to draw over 50,000 people—at times all congregated in the Deer District. Elliot Hughes, *Milwaukee Police's 15-Day Video Release Policy Will Not Be in Effect During 2024 Republican National Convention*, Milwaukee J. Sentinel (May 18, 2023), https://bit.ly/49LqL3b.

27. Protests and other public safety concerns are likely to occur during the Convention. *See, e.g.*, *Coalition to March on the RNC 2024: Coalition to Protest Outside 1st GOP Debate, Prelude to Larger March Next July*, WisPolitics (Aug. 18, 2023), https://bit.ly/3MTR3qq.

28. Over 4,500 law enforcement officials will be present. Hughes, *supra*.

29. The Center for Domestic Preparedness has been training responders for mass casualty incidents. FEMA Center for Domestic Preparedness, *CDP Prepares Responders for 2024 Republican National Convention*, https://bit.ly/3R4EPNY.

30. The City plans to purchase special insurance against terrorism and deadly-weapons risks. *City of Milwaukee Purchasing Division Request for Proposal #19954*, https://bit.ly/46t5fgS.

31. The expected influx of Convention attendees and emergency service providers is likely to cause a significant strain on Verizon's existing network without the proposed small cell installations.

32. To serve as a reference point, when the Bucks were in the NBA Championship, there was a large crowd gathered outside for "watch parties," and Verizon's existing network was not dense enough in the area to adequately support the large number of devices accessing the Verizon network. Even law enforcement and first

responders with priority access experienced connectivity issues during the event. Other devices without priority access experienced text messaging delays and failures, and experienced reliability issues when placing voice calls.

33. The upcoming Convention will create increased demand for wireless service in this area, which will also cause excess network traffic on the neighboring sites that provide coverage in the surrounding area. In short, the influx of attendees and emergency service providers at the Convention will likely cause significant coverage gaps at peak times in certain areas in and around the Deer District.

34. These significant service gaps can be remedied by the installation of small cells in precise locations. Without the installation of these small cells, Verizon customers, Convention attendees, and emergency service providers using their devices at peak usage times in and around the Deer District could experience diminished call quality, slow and unreliable data transmission speeds, call drops, and blocked calls.

**D. Verizon applies to the City for permission to install four small cells.**

35. For the last year, Verizon has worked to identify locations that could accommodate small cells to prevent the identified service gap in Verizon's wireless network during the Convention. Verizon determined that four small cells are needed to adequately address the network need.

36. Verizon selected locations for the small cells after a careful vetting process.

37. Indeed, Verizon Traffic Engineers and System Performance Engineers have analyzed the data from multiple high-capacity events (e.g., Harley Fest, Bucks Championship games, Lollapalooza, etc.) and identified the appropriate site density required around Fiserv Forum to maintain basic connectivity during high-capacity events for public safety.

38. These new small cells will provide enough additional capacity to support that level of basic connectivity to ensure that a high population of devices in the area are able to connect for text messaging and voice calls. First Responder devices will further benefit from the added capacity via prioritized access.

39. Initially, Verizon proposed collocating the small cells on existing poles, but the City informed Verizon that collocation would not be available and any such permit applications would not be approved.

40. Verizon then determined it had no choice but to construct new poles. Verizon selected four locations for these new poles based on network need and engineering requirements, as well as to avoid conflict with existing underground utilities.

41. One pole and small cell is to be located immediately north of the Fiserv Forum along Juneau Avenue. The other three are to be located to the east of the Fiserv Forum within the Deer District Pedestrian Mall (4th Street / Vel Phillips Avenue).

42. All four poles look the same and are custom-designed to match the character and design of other existing utility poles in the vicinity.

43. Each pole and accompanying small cell requires two separate permits from the City of Milwaukee Department of Public Works: a pole-and-anchor permit and an excavation permit. *See* City of Milwaukee, Wis., Code §§ 115-3, 115-21.

44. To ensure the poles and small cells are installed and operational ahead of the Convention, Verizon must order the poles and other necessary equipment no later than January 29, 2024. The custom-ordered poles and other ancillary equipment are much more expensive than standard poles and can take three months or more to be manufactured and delivered to Verizon. But because the poles are custom and can only be used for these specific Deer District locations, Verizon cannot order the poles until it has the required permits confirming that the City has approved them. Accordingly, if the permits are not issued by January 29, 2024, it is highly unlikely the poles can be ordered, manufactured, delivered, and installed in time to serve their primary purpose.

45. On August 3, 2023, Verizon (through its consultant, Ramaker & Associates) submitted eight permit applications for the four locations:

| Site Name | Pole & Anchor Application No. | Excavation Application No. |
|---|---|---|
| Juneau_5th_SC (Juneau Ave) | PWPA-23-00131 | PWEU-23-01508 |
| Deer District_SC | PWPA-23-00130 | PWEU-23-01506 |
| Deer_District_Center | PWPA-23-00132 | PWEU-23-01509 |
| DeerDistrict_Alleyway | PWPA-23-00133 | PWEU-23-01510 |

46. The approximate locations of the proposed poles and small cells appear below:



47. Under federal and state law, the City had a 90-day "shot clock"—until November 1—to approve or deny those applications, supported by written grounds. FCC Order ¶ 105; Wis. Stat. § 66.0414(3)(c)1.d.

**E.   The City approves one application—but denies the other three based on conclusory, unsupported assertions.**

48. In October, the City approved the two permit applications for the Juneau Avenue location.

49. On or around October 26, 2023, the City sent an automatic email for each of the other six permit applications, stating that the applications were "not approved."

50. Those emails directed the applicant to log into the City's land management system to view comments related to the "not approved" designation. The comments read, in their entirety:

Poles are too close to existing poles, and "…may not obstruct or hinder travel…on or around the right-of-way….", per s. 66.0414(2)(e)1 of the State statutes.

Aesthetic requirement of "unsightly or out-of-character deployments" per 66.4014(3)(c)4.a of the State statutes.

51. In subsequent email correspondence, the City confirmed that the October automatic emails and the cross-referenced comments constituted denials of the six permit applications for the three proposed Deer District locations. (From this point forward, these six denied permit applications will be referred to as the "Permit Applications.").

52. The City's denials of the Permit Applications are likely to result in service gaps in Verizon's wireless network at times of peak usage during the Convention and other significant events in and around the Fiserv Forum and the Deer District.

## FIRST CLAIM FOR RELIEF
## Violation of 47 U.S.C. § 332(c)(7)(B)(iii)
## Lack of Substantial Evidence

53. Verizon restates and incorporates by reference the allegations above.

54. The Telecommunications Act requires that "[a]ny decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." 47 U.S.C. § 332(c)(7)(B)(iii).

55. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera v. NLRB*, 340 U.S. 474, 477 (1951) (internal quotations omitted). Although not necessarily a preponderance, "more than a scintilla of evidence" is required. *Cellular Tel. Co. v.*

*Town of Oyster Bay*, 166 F.3d 490, 494 (2d Cir. 1999). "[C]ritical findings" must find "record support." *Orchard Hill Bldg. Co. v. U.S. Army Corps of Eng'rs*, 893 F.3d 1017, 1027 (7th Cir. 2018).

56. The City cited no evidence showing how the proposed poles are "too close to existing poles" or how they would "obstruct or hinder traffic." No such evidence exists in the record. This "critical finding[ ]" lacks any "record support." *Orchard Hill*, 893 F.3d at 1027.

57. The City likewise cited no evidence showing how the proposed poles are "unsightly," "out-of-character," or otherwise aesthetically displeasing. Indeed, the poles will match the existing poles in the Deer District. Such unexplained, unsupported aesthetic concerns do not constitute substantial evidence.

## SECOND CLAIM FOR RELIEF
### Violation of 47 U.S.C. § 332(c)(7)(B)(i)(II)
### Effective Prohibition of Personal Wireless Services

58. Verizon restates and incorporates by reference the allegations above.

59. The Telecommunications Act provides that a local government "shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II).

60. Local government action "constitutes an effective prohibition if it materially limits or inhibits the ability of any competitor or potential competitor to compete in a fair and balanced legal and regulatory environment." FCC Order ¶ 35.[1]

---

[1] The FCC's interpretation controls. *See Nat'l Cable & Telecommunications Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982–83 (2005).

61. An effective prohibition includes materially limiting or inhibiting a provider's efforts to "ent[er] . . . in[to] a particular area," "densify[ ] a wireless network, introduc[e] new services[,] or otherwise improv[e] service capabilities." *Id.* ¶ 37.

62. The City's "[p]oles are too close" rationale flunks this test. Given that the proposed locations are Verizon's best options considering network needs, and the fact that the existing poles were not available for use, the City's rationale materially inhibits Verizon's efforts to "ent[er] . . . in[to] a particular area," "densify[ ] [its] wireless network," and "otherwise improv[e] service capabilities." FCC Order ¶ 37.

63. The City's objections regarding aesthetics also are insufficient to support the denials. Federal law limits how a local government can regulate aesthetics. Any aesthetic requirements must be both "reasonable" and "objective and published in advance." FCC Order ¶¶ 85–88, 91. The City had not adopted "in advance" any aesthetic requirements "governing the deployment of small wireless facilities," much less ones that are "objective" and "reasonable." FCC Order ¶¶ 85–88, 91. The City's choice to nevertheless deny the Permit Applications based on "aesthetics" constitutes an effective prohibition as a matter of law. FCC Order ¶¶ 85–88, 91.

64. If Verizon is unable to install small cells in the Deer District to serve the Convention, there will be a significant service gap in Verizon's wireless communications network. As a result, and Verizon will be prohibited from providing reliable wireless service to Convention patrons and emergency service providers.

### THIRD CLAIM FOR RELIEF
### State Law Judicial Review

65. Verizon restates and incorporates by reference the allegations above.

66. Under Wisconsin Statutes section 66.0414(5), "a court of competent jurisdiction shall determine all disputes arising under this section."

67. Under state law, a city "*shall approve* a permit application unless it does not meet the applicable codes, [subparagraph 66.0414(2)(e)1.], or the standards of an ordinance enacted pursuant to [subparagraph 66.0414(2)(e)1.]." Wis. Stat. § 66.0414(3)(c)1.h. (emphasis added).

68. If a city denies a permit, it must proceed on a correct theory of law, act reasonably and non-arbitrarily, and support its decision with substantial evidence. *See Hartland Sportsmen's Club, Inc. v. City of Delafield*, 2020 WI App 44, ¶ 4 n.1, 393 Wis. 2d 496, 947 N.W.2d 214. Indeed, review of a permit denial can be had by common-law certiorari. A court reviews a municipality's decision to determine: "(1) whether the municipality kept within its jurisdiction; (2) whether it proceeded on a correct theory of law; (3) whether its action was arbitrary, oppressive, or unreasonable and represented its will and not its judgment; and (4) whether the evidence was such that it might reasonably make the order or determination in question." *Id.* (citing *Ottman v. Town of Primrose*, 2011 WI 18, ¶ 35, 332 Wis. 2d 3, 796 N.W.2d 411).

69. The City's denials are not supported by the support of substantial evidence, as explained above. *See supra* ¶¶ 53–57.

70. Not only are the denials unsupported by any evidence, but they also "run counter to the evidence" that is available. *Preston v. Meriter Hosp., Inc.*, 2008 WI App 25, ¶ 36, 307 Wis. 2d 704, 747 N.W.2d 173 (quoting *Motor Vehicle Mfr. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). That means the denials

were arbitrary in violation of state law. *Id.*; *see Hartland Sportsmen's Club*, 2020 WI App 44, ¶ 4 n.1.

71. Both of the City's reasons for denial also run headlong into Wisconsin statutory law. The City first claims that the "[p]oles are too close to existing poles." But the distance between poles is not a basis for denial allowed by statute. The City also never explains *how* the poles would obstruct or hinder travel. This failure of explanation is contrary to law and arbitrary.

72. The City's second reason for denial is "aesthetics." State law limits how a local government can regulate aesthetics. Section 66.0414 allows a city, in a prospective way, to "*adopt* aesthetic requirements governing the deployment of small wireless facilities." *Id.* § 66.0414(3)(c)4. (emphasis added). Such aesthetic requirements "must be" both "no more burdensome than those applied to other types of infrastructure deployments; and [ ] objective and published in advance." *Id.*

73. Here, contrary to state law, the City has not "adopt[ed]" "in advance" any aesthetic requirements "governing the deployment of small wireless facilities." *Id.* § 66.0414(3)(c)4.

## PRAYER FOR RELIEF

WHEREFORE, Verizon respectfully requests that the Court:

A. Conduct expedited review and disposition of this action under 47 U.S.C. § 332(c)(7)(B)(v)—and in all events, no later than January 29, 2024, *see supra* ¶ 44;

B. Preliminarily enjoin Defendants to approve Verizon's Permit Applications and to grant all necessary permits for construction and operation of the facilities proposed in those applications;

C. Issue an appropriate order directing Defendants to certify to this Court a true, full, and complete copy of the record of the acts and procedures involved in the denial of Verizon's Permit Applications so that this Court may review the data and records and adjudicate upon the legality of said proceedings;

D. Declare that Defendants' denials of Verizon's Permit Applications violated 47 U.S.C. §§ 332(c)(7)(B);

E. Permanently enjoin Defendants to approve Verizon's Permit Applications and to grant all necessary permits for construction and operation of the facilities proposed in those applications;

F. Issue a writ of mandamus directing Defendants to discharge all relevant duties to approve Verizon's Permit Applications and to grant and issue all necessary permits for construction and operation of the facilities proposed in those applications;

G. Under state law, declare that Defendants' denials of Verizon's Permit Applications were arbitrary, capricious, unreasonable, contrary to law, and unsupported by substantial evidence;

H. Under state law, reverse Defendants' denials of Verizon's Permit Applications and issue an order directing Defendants to issue all necessary permits for construction and operation of the facilities proposed in those applications;

I. Issue an order reserving jurisdiction to this Court to resolve any issues between the parties as to further permit issues;

J. Award costs and fees, including attorneys' fees, as may be available under law; and

K. Award such other and further relief as the Court deems just and proper.

Dated: November 24, 2023

| | /s/ Joseph S. Diedrich |
|---|---|
| Rodney W. Carter | Joseph S. Diedrich |
| James C. Remington | HUSCH BLACKWELL LLP |
| HUSCH BLACKWELL LLP | 33 East Main Street, Suite 300 |
| 33 East Main Street, Suite 300 | Madison, Wisconsin 53703 |
| Madison, Wisconsin 53703 | 608.255.4400 |
| 608.255.4400 | |

*Counsel to Plaintiff*