UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

CELLCO PARTNERSHIP d/b/a
VERIZON WIRELESS,

        Plaintiff,

        v.                                    Case No. 23-cv-1581-bhl

CITY OF MILWAUKEE and COMMISSIONER OF
PUBLIC WORKS JERREL KRUSCHKE,

        Defendants,

DEER DISTRICT LLC,

        Intervenor.

---

## DECISION AND ORDER

---

        In this lawsuit, Plaintiff Cellco Partnership d/b/a Verizon Wireless (Verizon) invokes the expedited review provisions of the federal Telecommunications Act (TCA) in pursuit of an order directing Defendants City of Milwaukee and its Commissioner of Public Works, Jerrel Kruschke, to provide permits allowing Verizon to construct "small cells," telecommunications equipment that will improve Verizon's otherwise inadequate service capabilities in a public plaza outside the Fiserv Forum. The City's written denial of Verizon's permit applications offered two abbreviated justifications: the proposed poles for the small cells were "too close to existing poles" and they violated the City's "[a]esthetic requirement[s]." When Verizon pushed back, the City came up with an additional (and untimely) justification—it claimed it lacked authority to issue the permits altogether, based on a lease and sublease arrangement with Intervenor Deer District LLC (Deer District). Verizon responded by filing this lawsuit, followed a few days later by a preliminary injunction motion.

        Verizon claims the City's refusal to grant the permits violated the TCA, which both requires that any denial of a permit be in writing and supported by substantial evidence, and precludes any denial that effectively prohibits the provision of wireless services. Verizon also

argues that the denials violate state law, which additionally limits the grounds on which a municipality can deny permits. Verizon maintains that time is of the essence because it needs to start the lengthy process of ordering equipment and planning for installation of the small cells so the project can be completed before the 2024 Republican National Convention, which will take place this summer at Fiserv Forum.

The Court held an initial hearing on Verizon's motion on January 19, 2024. Both Verizon and the City argued in support of their positions. Although the City insisted that Deer District, the sublessee of the public plaza, was a required party, it failed to notify Deer District of the hearing. Accordingly, the Court continued the hearing to January 24, 2024. In the interim, Deer District filed a flurry of papers, seeking to intervene, to dismiss Verizon's complaint, and to disqualify Verizon's counsel, Husch Blackwell. For reasons stated on the record, the Court allowed Deer District's intervention, deferred ruling on its motion to dismiss, and granted its motion to disqualify. Acknowledging a concurrent conflict of interest, Verizon's counsel helpfully had replacement counsel ready to stand in, so the Court proceeded with the hearing, which the parties agreed should be advanced to a trial on the merits under Federal Rule of Civil Procedure 65(a)(2). Verizon and Deer District then offered additional arguments and witness testimony to supplement the declarations and exhibits on file. The City offered no additional evidence and only limited additional argument, largely deferring to Deer District's counsel. The Court took the matter under advisement and has endeavored to provide a prompt decision given Verizon's stated timing needs.

Based on the evidence submitted, the Court will enter judgment in Verizon's favor and against the City. The credible evidence confirms that the City's professed reasons for denying Verizon's permit applications were not supported by substantial evidence and were, in fact, a mere pretense. The Court finds that the City's actual reason for denying the permits was to assist its sublessee, Deer District, a private entity that prefers Verizon to use an alternate system, a distributed antenna system (DAS), which Deer District and a coventurer are developing. Testimony confirms that, if the permits are denied, Verizon will have little choice but to pay a heavy sum (including an initial payment of $10 million) to use Deer District's DAS. The City's professed justifications for denying the permits were pretextual, not supported by substantial evidence, and in violation of both the TCA and state law. Accordingly, the Court will order the City to issue the requested permits.

# FINDINGS OF FACT

Plaintiff Verizon is a Delaware partnership authorized to do business in Wisconsin. (ECF No. 1 ¶5.) Defendant City of Milwaukee is a municipality organized under the laws of Wisconsin. (*Id.* ¶6.) Defendant Jerrel Kruschke is the City's Commissioner of Public Works. (*Id.* ¶7.) Intervenor Deer District is a limited liability company and affiliate of the Milwaukee Bucks, LLC, which is itself an affiliate of ArenaCo. (ECF No. 26 ¶¶1–2; ECF No. 16-4 at 6.) ArenaCo owns and operates the National Basketball Association (NBA) team known as the Milwaukee Bucks. (ECF No. 16-4 at 6.) The Milwaukee Bucks play their home games in a downtown Milwaukee arena called the Fiserv Forum. (*See* ECF No. 6-4 at 4.)

Central to this dispute is the area just outside the Fiserv Forum, including a pedestrian mall known as the Deer District Public Plaza (Plaza). In 2016, the City leased the area now encompassing this pedestrian mall to the Wisconsin Center District (WCD), a "special purpose local exposition district" that is a unit of government under Wis. Stat. § 229.42. (ECF No. 16-3 at 3; ECF No. 16-4 at 6.) The WCD then subleased the area to Deer District. (*Id.*)

Since at least the Spring of 2023, Verizon has been working to address service needs in the Plaza. Verizon experienced service problems in this area during June of 2021, when the Milwaukee Bucks competed in and won the NBA Championship. During the championship series, large crowds gathered in the Plaza for watch parties. (ECF No. 1 ¶¶25, 32.) These crowds strained Verizon's existing cellular network, which was not dense enough to adequately support the number of devices attempting to access it. (*Id.* ¶32.)

Verizon's need to improve its service capabilities in this area became more urgent with the announcement that the Fiserv Forum will host the 2024 Republican National Convention (RNC). The RNC is expected to draw 50,000 people to the area from July 15 through July 18, 2024. (*Id.* ¶¶24–26.) Hoping to resolve service issues in advance of the RNC, Verizon sought to install "small cells," a type of wireless service facility that provides data coverage to cell phone users in an area, to bolster its cellular network coverage and remedy the service gaps. (*Id.* ¶¶33–35.) Verizon spent substantial time in 2023 scouting locations in and around the Plaza to accommodate these small cells. (*Id.*)

Initially, Verizon asked the City to "collocate" (that is, co-locate) the necessary small cells on existing poles in the Plaza. (*Id.* ¶39.) The City rejected this approach, telling Verizon that collocation was not an option because the City did not own the poles and thus could not approve

any permit applications for collocation. (*Id.*; ECF No. 18 ¶7.) The existing poles are owned by Deer District, which would not allow Verizon to collocate its equipment on them. (ECF No. 18 ¶7.)[1]

With collocation unavailable, Verizon elected to proceed with an alternate plan by which it would construct its own small cell poles. (ECF No. 1 ¶40.) Based on studies of its service needs, Verizon concluded that four small cells and four accompanying poles would be required in four locations, dubbed "Juneau_5th_SC," "Deer_District_SC," "Deer_District_Center," and "DeerDistrict_Alleyway." (*Id.* ¶¶40–46.) Verizon custom-designed poles for these locations to match the existing utility poles in the Plaza. (*Id.* ¶42.)

This was not Verizon's first time working with the City on small cell construction and deployment. Verizon and the City are parties to a March 16, 2016 "Small Cell" Master License Agreement and an August 1, 2021 Small Wireless Facility Master License Agreement. (ECF No. 18 ¶4.) Under these agreements, Verizon has received City approval for the installation of more than 200 small cell poles. (*Id.* ¶5.) Verizon's small cell construction accounts for about 40% of the overall cell deployment in the City. (*Id.*) As part of this process, the City gave Verizon a document entitled "Vetting Process – Small Cell Sites," describing, among other things, aesthetic requirements, rules, and guidelines for selection of small cell pole locations. (*Id.* ¶6.) The Vetting Process document generally requires small cell poles to be either high-level street light poles or traffic signal poles; not placed directly in front of any houses, windows, "hollow walk," or balconies; at least fifteen feet from any entrances; maintaining five feet of pedestrian walkway and outside of pedestrian ramp limits; not on the "far-side" of an intersection; and not obstructing the view of a sign, billboard, screen, City of Milwaukee landmark or point of interest. (ECF No. 18-1 at 2–3.)

Because Verizon was proposing custom-designed poles to match the existing poles in the area, Verizon's plan required extra lead time. Verizon determined that, given the need to special order the poles and other equipment, any orders need to be placed by January 29, 2024, to leave enough time for ordering, manufacturing, delivery, and installation prior to the RNC. (ECF No. 1 ¶44.) Accordingly, on August 3, 2023, nearly a year before the RNC, Verizon, through a subcontractor, submitted permit applications for the four proposed small cell installations. (*Id.*

---

[1] Deer District has allowed one of Verizon's competitors, AT&T, to install small cells on two existing poles. (ECF No. 18 ¶11.)

¶45.) Consistent with City requirements, each location required two permits, one for a pole and anchor and a second for excavation. (*Id.* ¶43.) The applications were submitted using the City's on-line system and Verizon then waited for the City's response. (*See id.* ¶¶45–47.)

The City was required to act promptly. Federal and state law both require municipalities to approve or deny applications for construction of small wireless facilities within ninety days. *Accelerating Wireless Broadband Deployment by Removing Barriers to Infrastructure Inv.*, 33 FCC Rcd. 9088, 9142 (2018); Wis. Stat. § 66.0414(3)(c)1.d. This deadline is colloquially known as the "90-day shot clock." Thus, the City was required to respond to Verizon's August 3, 2023 applications by November 1, 2023. (ECF No. 1 ¶47.)

On October 24, 2023, the City approved two of the permit applications—those relating to the Juneau Avenue location. (*Id.* ¶48; *see also* ECF No. 7-11.) Two days later, however, on October 26, 2023, the City denied the remaining six permit applications. (ECF No. 1 ¶49.) The City's explanation for the denial consisted entirely of the following:

> Poles are too close to existing poles, and "…may not obstruct or hinder travel…on or around the right-of-way….", per s. 66.0414(2)(e)1 of the State statutes.
>
> Aesthetic requirement of "unsightly or out-of-character deployments" per 66.4014(3)(c)4.a of the State statutes.[2]

(*Id.* ¶50.) Two weeks later, on November 8, 2023, Verizon's counsel emailed a letter to Kruschke concerning the permit denials. (*See* ECF No. 6-1 at 4.) In a subsequent exchange of emails, the City confirmed its written explanation for the denials. (ECF No. 6 ¶2; ECF No. 6-1.)

In the meantime, the City was having conversations with Deer District representatives about justifying the permit denials. On October 27, 2023, one day after the City denied the permits, counsel for Deer District emailed Assistant City Attorney Thomas Miller. (ECF No. 16-5.) In that email, counsel told Miller that the City's lease with WCD, which underlies WCD's sublease with Deer District, precluded the City from granting Verizon permits to install small cells in the Plaza. (*Id.* at 1.) According to Deer District, the lease and subleases gave it a "private property right" in the Plaza and expressly prohibited commercial activities by others. (*Id.*) The email also referenced Deer District's ongoing plan to implement "a distributed antenna system" (DAS), which would be an alternative to Verizon's requested small cells. (*Id.*)

---

[2] The City concedes the citation in the second justification includes a typo. The City intended to cite Wis. Stat. § 66.0414(3)(c)4.a.

On November 10, 2023, the City Attorney's Office sent a letter to Verizon's counsel, supplementing its reasons for denying Verizon's applications. (ECF No. 6-3.) The City now claimed that it lacked authority to grant third-party permits for small wireless facility pole installations in the Plaza. (*Id.* at 1.) Parroting the position provided to it by Deer District's counsel, the City pointed to the lease and sublease arrangement between the City, the WCD and Deer District, and disclaimed any authority to issue permits in the Plaza. The City told Verizon it had conveyed virtually all power over the Plaza to Deer District, except for limited rights reserved for public transportation and public access. (*Id.*) It further claimed that any public access rights "expressly exclude any commercial activities or operations by members of the public not expressly allowed by WCD/Deer District." (*Id.*)

At the January 24 hearing, the parties offered additional testimony about the DAS referenced in Deer District's communications with the City. Deer District offered testimony from Steven Dutto, the Chief Executive Officer of DGP and Deer District Chief Legal Officer, Michael T. Sneathern. Dutto explained that DGP is a private company that builds DAS systems for indoor and outdoor uses, including at sports venues. (ECF No. 40 at 78:6–8.) He described DGP's work with Deer District in developing a DAS to improve cell service in the Plaza and in two adjacent buildings. (*Id.* at 78:18–83:17.) DGP and Deer District planned to allow carriers expressing interest in the public plaza to use the DAS in exchange for a fee. (*Id.* at 83:2–84:3.) The DAS fee is $10 million upfront, and an additional $10,000 per month that increases 3.5 percent per year. (*Id.* at 71:14–20.) Sneathern offered brief testimony expressing his concerns about having too many poles in the Plaza. (*Id*. at 87:18-88:1.)

Verizon called Tanya Rosin, its network legal counsel, as a witness. (*Id.* at 65:18.) She explained that Verizon had concerns about compatibility issues between its existing network and the DAS. (*Id*. at 69:24–70:8.) As currently proposed, the DAS being developed by Deer District and DGP would not meet Verizon's needs. (*Id*. at 72:4–6.) She also expressed concerns about the cost Deer District and its coventurer were asking. (*Id.* at 70:12–15, 71:14–23.) As a result of these concerns, Verizon elected to proceed with construction of its own small cell equipment rather than contracting to use the DAS.

# LEGAL ANALYSIS AND CONCLUSIONS OF LAW

Verizon claims that the City violated both federal and state law when it denied Verizon's permit applications for locations within the Plaza. With respect to federal law, Verizon asserts that the City violated TCA provisions requiring municipalities to support permit denials with substantial evidence and barring local regulations that have the effect of prohibiting the provision of wireless services. Verizon further asserts the City violated several subsections of Wis. Stat. § 66.0414. Because the record confirms that the City violated both federal and state law through its denials of Verizon's permit applications, the Court will grant Verizon's request for injunctive relief and enter judgment for Verizon on its claims.

## I. The City's Denials of Verizon's Permit Applications Violated the TCA.

Congress enacted the TCA to, among other things, address local government decisions that were unreasonably retarding the growth of cellphone and other wireless services. *See PrimeCo Pers. Commc'ns, Ltd. P'ship v. City of Mequon*, 352 F.3d 1147, 1148 (7th Cir. 2003). Accordingly, while the statute does not completely preempt local government regulatory authority "regarding the placement, construction, and modification of personal wireless service facilities," the TCA puts conditions on local governments' exercise of that authority. *See* 47 U.S.C. § 332(c)(7). When a municipality denies a permit application, it must do so in writing and provide "substantial evidence" to support the denial. § 332(c)(7)(B)(iii). And, any local government regulation may not "unreasonably discriminate among providers of functionally equivalent services" or "prohibit or have the effect of prohibiting the provision of personal wireless services." § 332(c)(7)(B)(i).[3] As further protection, both federal and state law provide municipalities with a 90-day "shot clock," or time limit, within which they must decide and explain why a permit is approved or denied. *See Accelerating Wireless*, 33 FCC Rcd. at 9142; Wis. Stat. § 66.0414(3)(c)1.d.

---

[3] Because the Court finds in Verizon's favor on alternate grounds, the Court will not address Verizon's claim that the City's denials constitute an "effective prohibition" under the TCA. Verizon's effective prohibition claim relies on a 2018 FCC declaratory ruling that includes an aggressive interpretation of the TCA's text. In that ruling, the FCC sharply criticized several courts' (including the Seventh Circuit's) interpretations of the TCA as being too narrow and based on "an outdated view of the marketplace." *See Accelerating Wireless*, 33 FCC Rcd. at 9106–07. It is far from clear that the TCA language is sufficiently ambiguous to warrant deference to the agency's interpretation under *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842–44 (1984). *See City of Portland v. United States*, 969 F.3d 1020 (9th Cir. 2020) (holding the FCC declaratory ruling was not entitled to *Chevron* deference.) Nor is it clear that the agency's 2018 declaratory ruling trumps prior Seventh Circuit caselaw interpreting the TCA. *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 982 (2005). The Court will steer clear of this legal thicket because wading in is unnecessary to the Court's ultimate resolution of Verizon's claims.

Verizon argues that the City's October 26, 2023 denials are not supported by substantial evidence. (ECF No. 5 at 16–18.) Verizon highlights the abbreviated justifications given for the denials and contends the City failed to support those justifications with any evidence, let alone substantial evidence. (*Id*.) The City's response arguments are two-fold. First, it insists that its October 26, 2023 denials were sufficiently supported because the City's reasoning was both "self-evident" and supported by the applications themselves. (ECF No. 15 at 16–18.) Second, the City, with support from Deer District, contends the denials were proper because the City lacked authority to grant them, as set forth in the City's November 10th letter. (*Id.* at 10–15.)

### A. The City's Justifications for the October 26, 2023 Permit Denials Are Not Supported by Substantial Evidence.

The TCA's substantial evidence standard is a "procedural safeguard" that is meant to ensure that a local government's decision is consistent with applicable zoning requirements already in place. *VoiceStream Minneapolis, Inc. v. St. Croix County*, 342 F.3d 818, 830 (7th Cir. 2003) (citing *ATC Realty, LLC v. Town of Kingston*, 303 F.3d 91, 94 (1st Cir. 2002)). It is the same deferential "substantial evidence" standard commonly used for judicial review of agency decisions. *Id.* (citing *Aegerter v. City of Delafield*, 174 F.3d 886, 889 (7th Cir. 1999)). In that context, substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Roadway Exp., Inc. v. U.S. Dep't of Labor*, 495 F.3d 477, 483 (7th Cir. 2007) (quoting *Brink's, Inc. v. Herman*, 148 F.3d 175, 179 (2d Cir. 1998)). It is also equivalent to the clearly erroneous standard applied by appellate courts to district court factfinding. *PrimeCo*, 352 F.3d at 1149.

While deferential, the standard does not mean municipal authorities have carte blanche to deny permit applications or that their decisions will be affirmed so long as they cobble together a justification to support the denial. Substantial evidence demands that the municipality provide a decision along with a supporting record sufficient to allow a reviewing court to identify the reason or reasons why the locality denied the application. *T-Mobile S., LLC v. City of Roswell*, 574 U.S. 293, 300 (2015). "[T]hese reasons need not be elaborate or even sophisticated, but rather . . . simply clear enough to enable judicial review." *Id.* at 302. More than a mere scintilla of evidence is required. *See Cellular Tel. Co. v. Town of Oyster Bay*, 166 F.3d 490, 495 (2d Cir. 1999). The party seeking to overturn a zoning decision bears the burden of proving the decision is not supported by substantial evidence. *VoiceStream*, 342 F.3d at 830 (citing *Am. Tower LP v. City of Huntsville*, 295 F.3d 1203, 1207 (11th Cir. 2002)).

The Seventh Circuit has analyzed the substantial evidence standard in the TCA context on three different occasions, one time agreeing that a municipality's decision failed to satisfy the standard and twice agreeing that a locality had done enough. In *PrimeCo*, the Court of Appeals affirmed a district court's conclusion that a Wisconsin municipality's denial of permits to a cell provider was not supported by substantial evidence and violated the TCA. 352 F.3d at 1151. The panel's analysis began with a discussion of the history of the TCA and the meaning of "substantial evidence" in the TCA context, emphasizing the need for a cost/benefit analysis demonstrating the reasonableness of granting or denying a permit application. *Id*. at 1148–49. The Court of Appeals next summarized the municipal record, including the city planning commission's hiring of a consulting firm to analyze the suitability of the proposed antenna location and the contents of two planning commission hearings on the matter. *Id.* at 1150. It then agreed with the district court that the municipality's denial of permits was not supported by substantial evidence. It emphasized that generalized aesthetic concerns did not satisfy the TCA standard; residents' statements that they didn't "like poles in general" and commission member concerns about creating a "slippery slope" that the city might soon "be covered by a forest of telecommunications towers" were insufficient. *Id*. The Court of Appeals also held inadequate the City's conclusory assertion that alternative sites were "good enough." *Id*. Echoing the district court's ruling, the Seventh Circuit noted it was "doubtful that the planning commission's decision [was] supported by any evidence at all." *Id.* at 1151. The district court's order that permits be issued was affirmed. *Id.*

The Seventh Circuit affirmed district court decisions upholding municipal decisions denying permits under the TCA in *VoiceStream* and *Helcher v. Dearborn County*, 595 F.3d 710 (7th Cir. 2010). In *VoiceStream,* the Seventh Circuit agreed that substantial evidence supported a locality's denial of permits where the county developed a substantial record identifying specific aesthetic concerns expressed by numerous citizens and organizations in support of its determination that the proposed tower would adversely impact the aesthetic harmony of the county's riverway. 342 F.3d at 831–32. The record included evidence of an on-site investigation, a county-prepared map showing the visibility of the antenna, and numerous testimonials that the "unique scenery" of the riverway would be diminished by the placement of the proposed facility. *Id.* at 832. Similarly, in *Helcher*, the Seventh Circuit affirmed a district court ruling holding that substantial evidence supported a locality's decision to reject a permit to place a 190-foot structure in a "picturesque rural area." 595 F.3d at 725. Again, the municipality had developed a detailed

record demonstrating that the wireless service provider had not satisfied the requirements of a preexisting ordinance governing construction of cell towers. *Id.* at 719–22.

The City's October 26 denial is not supported by substantial evidence. The City admits its decision on all six rejected permit applications consisted entirely of two fragmented sentences:

> Poles are too close to existing poles, and "…may not obstruct or hinder travel…on or around the right-of-way….", per s. 66.0414(2)(e)1 of the State statutes.
>
> Aesthetic requirement of "unsightly or out-of-character deployments" per 66.4014(3)(c)4.a of the State statutes.

(ECF No. 6-1 at 1.) The supporting record consists of Verizon's application and a number of similarly cryptic entries in the City's on-line permit application system. (ECF Nos. 7–7-32.) This minimal effort falls short of the requirements imposed on municipalities by Congress in the TCA.

The Court is cognizant of the deference it must give the City's decision, even if inartfully drafted. Courts recognize that municipal workers are not trained in the basics of legal writing and, thus, a decision denying permits need not be "elaborate or even sophisticated." *See T-Mobile*, 574 U.S. at 302; *see also Helcher*, 595 F.3d at 719 (noting that a decision need not be akin to a judicial opinion given that "local zoning boards typically are not populated with lawyers much less judges.") But the decision must "describe the reasons for the denial and contain a sufficient explanation of those reasons to allow a reviewing court to evaluate the evidence in the record that supports those reasons." *Helcher*, 595 F.3d at 718 (citing *New Par v. City of Saginaw*, 301 F.3d 390, 395–96 (6th Cir. 2002)).

The City's denial of Verizon's permit applications flunks this relatively minimal test. The justifications themselves are meager. They offer no reasoning and do not cite any evidence. Indeed, the City's supporting record is also sparse. The City's effort to support its decision is far below any of the records discussed by the Seventh Circuit in *PrimeCo*, *VoiceStream*, and *Helcher*. Here, there is nothing to suggest that the City held a hearing, took testimony, consulted with experts, or engaged in *any thoughtful analysis* before denying Verizon's applications. The City's written record is even significantly below that found to be insufficient in *PrimeCo*. In *PrimeCo*, the municipal planning commission consulted experts and held two public hearings, but even with the benefit of the hearing transcripts, this Court (Judge Adelman) and the Seventh Circuit held the resulting denial was not supported by substantial evidence in a written record. 352 F.3d at 1147–

51. This is not to suggest that a hearing is always necessary. But there must be some evidentiary record supplying a basis for the denial.

More significant, however, than the paucity of the written record itself is the lack of any written analysis connecting the City's conclusions to evidence in the record. The City did not give Verizon even a basic explanation for the denials that was tied to anything in the record. This failure makes any judicial review (beyond mere "rubber-stamp" review) virtually impossible. Indeed, the two justifications offered by the City on October 26 are hard to square with the record. The City's first reason, the proximity of the poles to existing poles, makes little sense considering that the City granted Verizon's permit applications on Juneau Street—around the corner from the pedestrian mall—where the pole was just one foot farther away than the requested pole placement in the pedestrian mall. (*See* ECF No. 5 at 17–18.) Perhaps this one-foot difference is material given the different locations, an argument the City suggested at oral argument. But the TCA requires that the denial be in writing and supported by a written record; it cannot be a perfunctory or conclusory denial to be filled in after-the-fact if challenged. Of course, the City could have explained why the Juneau Street pole placement was appropriate while the poles in the Plaza were not; but it did not to do so. The City's second reason, concerning the aesthetics of the poles, is even worse. The City's assertions that the proposed poles are "unsightly" or "out-of-character" makes no sense given the evidence that Verizon designed the poles to match those already in the Plaza. And, again, the City's denial offers no reasoning that would connect the denial with anything in the record.[4]

During argument, the City tried to overcome its failure to supply reasoning for the denials, claiming that "one could imagine" the problem with the pole placement. (*See* ECF No. 22 at 57:2–9.) This is precisely the type of unexplained municipal decision-making the substantial evidence standard seeks to preclude. Imagination is the opposite of written reasons supported by substantial evidence in a written record. Leaving a blank canvas open to speculation is not the equivalent of a reasoned decision. Easy to imagine or not, this is not what Congress, nor the large body of caselaw interpreting the statute, had in mind in enacting or interpreting the TCA. The City also emphasized at oral argument the "low standard" and "highly differential standard" on it to support

---

[4] Verizon has supplied the Court with a City pamphlet entitled "Vetting Process – Small Cell Sites," which includes City guidance concerning the permitting process and City requirements. (ECF No. 18-1.) The City's denials do not reference this document or any other City ordinances or preexisting zoning rules.

its denials. (ECF No. 40 at 111:5–25.) Downplaying the minimal record it created, the City argued that Verizon's permit applications themselves provided substantial evidence in the record for the denials. (*Id.* at 111:10–113:21.) While this Court must apply a deferential standard of review, the City's arguments, if accepted, would gut that review and render it meaningless. Caselaw is again clear that conclusory statements cannot provide substantial evidence in support of a denial and that substantial evidence requires, at a minimum, a basis on which a court can conduct judicial review of the municipality's decision. The City's October 26 denials fail to provide this Court with any "satisfactory explanation" for the City's action and preclude meaningful judicial review. *See T-Mobile*, 574 U.S. at 301–02. Both reasons the City provided are the exact type of conclusory statements the Seventh Circuit has explained cannot satisfy the substantial evidence standard. Condoning such efforts would defeat the entire reason for subjecting such decisions to judicial review, as Congress elected to do in enacting the TCA.

The record confirms one final critical failing in the City's October 26 denials—the justifications the City offered were not the real reasons City officials decided to deny Verizon's applications. The credible evidence confirms that the City actually denied the applications to assist a private entity, Deer District, in gaining Verizon as a customer for the DAS project being developed by Deer District and DSG.

### B. The City's Untimely November 10, 2023 Letter Both Undercuts the City's Stated Position and Fails to Satisfy the City's Burden Under Federal Law.

Likely recognizing the inadequacy of its denials, the City attempted to bolster its rejection of Verizon's permit applications with an entirely new reason, set forth in its November 10, 2023 letter. This after-the-fact attempt to craft a justification for the denials does not cure the City's TCA noncompliance.

As an initial matter, the City's deadline under both state and federal law to provide a written decision supported by substantial evidence for denying the permits was November 1, 2023. *Accelerating Wireless*, 33 FCC Rcd. at 9142; Wis. Stat. § 66.0414(3)(c)1.d.; (ECF No. 1 ¶47.) Any justification offered after that date is untimely and irrelevant. *See Upstate Cellular Network v. City of Auburn*, 257 F. Supp. 3d 309, 315 (N.D.N.Y. 2017) (noting that FCC's shot clock contemplates that the application will be resolved before the deadline); *New Cingular Wireless PCS, LLC v. Town of Stoddard*, 853 F. Supp. 2d 198, 203 (D.N.H. 2012) (confirming the same). For this reason alone, the City cannot save its bacon by asserting it lacks authority to issue the permits.

But more problematic is that the November 10 justification—based on the City's claimed lack of authority—was entirely new. Neither of the two justifications the City offered on October 26, 2023 are based on—or even hinted at—the City's purported lack of authority to issue the permits. Rather, the City claimed it was denying the permit applications because the proposed poles were too close to existing poles and because of aesthetic concerns. The TCA required the City to rule on Verizon's applications in a written decision supported by substantial evidence. § 332(c)(7)(B)(iii). Federal regulations and state law required the City to complete this process within 90 days. *Accelerating Wireless*, 33 FCC Rcd. at 9142; Wis. Stat. § 66.0414(3)(c)1.d. By coming up with a completely different explanation two weeks later, after the 90-day shot clock had expired, and based on arguments fed to it by Deer District, the City casts considerable doubt on whether it was being truthful in its initial written justifications. The change in the City's story supports the conclusion that the City's initial decision and explanation were false and a mere pretense, hiding the City's true motives.[5]

Timeliness and credibility aside, the City's authority argument also fails as a matter of fact and law. The City (and Deer District) maintain that the City's lease arrangements with the WCD and Deer District stripped it of any authority to grant Verizon the permits. They insist that the City transferred ownership of the Plaza to the WCD, which in turn subleased those rights to Deer District, and, under the lease and sublease agreements, all right to install improvements and allow commercial activities in the Plaza reside in Deer District. (ECF No. 15 at 11.) Therefore, although the Plaza "is technically right-of-way," the City has no "legal control" over it. (*Id.* at 11–12.)

Central to this argument is the City's and Deer District's position that the Plaza is not a right-of-way. This position is fundamentally wrong. The Wisconsin Supreme Court explained more than 140 years ago that a right-of-way, "in its strict meaning, is the right of passage over another man's ground," and in legal terms, is an easement for public use. *Williams v. W. Union Ry. Co.*, 5 N.W. 482, 484 (Wis. 1880) (quotation omitted). An owner whose property contains a right-of-way "has no right to enclose it with fences. His right of occupancy is not exclusive . . . ." *Kleih v. Van Schoyck*, 27 N.W.2d 490, 493 (Wis. 1947). This well-established understanding of a

---

[5] During argument, the City argued that concerns about its authority were not new and pointed to a comment in its on-line permit review system. The comment, dated October 24, 2023, states "Placement of poles in the Fiserv Forum Plaza may not be permissible. Please contract Ibrahim Amin . . . for further coordination. (ECF No. 7-11 at 7.) This note appears to suggest some concerns about the placement of poles in the Plaza. There is no question, however, that neither this concern, nor the City's alleged lack of authority to grant the permits, found their way into the written denials the City provided Verizon.

right-of-way provided the backdrop for the Wisconsin legislature's definition of the term when it enacted Wis. Stat. § 66.0414 in 2019. Consistent with longstanding Wisconsin law, Wis. Stat. § 66.0414(1)(t) defines a right-of-way as "the area on, below, or above a highway . . . other than a federal interstate highway; sidewalk; utility easement; . . . or other similar property . . . ." § 66.0414(1)(t).

Under these definitions, the Plaza is clearly a right-of-way. The Plaza was built with the express intention of being a gathering place—clearly within the definition of an easement for public use under *Williams*. The City itself advertises the Plaza as "a neighborhood built for Milwaukee to live, work and play."[6] The City's own description is not one of a party who intends to keep the occupancy right exclusive. *See Kleih*, 27 N.W.2d at 493. And under Wis. Stat. § 66.0414(1)(t), the Plaza is a pedestrian mall in which the City retained rights. While not a highway or sidewalk *per se*, it is certainly "other similar property" within the catchall portion of the definition.

The City and Deer District nevertheless maintain that the Plaza is, for purposes of this case at least, not a right-of-way. Yet in response to the Court's questioning at the January 19 hearing, the Assistant City Attorney conceded that the Plaza was "technically" right-of-way property. (ECF No. 22 at 12:14–17.) He half-heartedly tried to walk this back at the January 24 hearing, when appearing alongside Deer District counsel. (ECF No. 40 at 107:1–109:24.) Regardless of how much the City wishes to help Deer District, its position is contrary to 140 years of Wisconsin law and to Wis. Stat. § 66.0414. It is also contrary to multiple documents in this case. The City's authority argument depends on the lease it signed with the WCD. But that lease includes an express acknowledgment by the WCD "that the Premises are a Pedestrian Mall that is held by City as public right-of-way subject to regulation . . . ." (ECF No. 16-3 at 9.) The City even referred to the Plaza as a right-of-way in its November 10, 2023 letter to Verizon. (ECF No. 6-3 at 1.) And, at the risk of piling on, the Court notes that the City's own briefing regularly refers to the Plaza as a right-of-way. (*See* ECF No. 15 at 11, 12, 14; ECF No. 14 at 10.)

The City and Deer District cannot save their position with extreme hairsplitting. They insist that the Plaza is a "right-of-way" for some purposes, including presumably those referenced in the lease and under Wisconsin law generally, but not "for purposes of Wis. Stat. § 66.0414."

---

[6] *See The Deer District*, City of Milwaukee Department of City Development, https://city.milwaukee.gov/DCD/BusinessToolbox/bids/TheDeerDistrict (last visited January 29, 2024).

(ECF No. 6-3 at 1–2.) Despite being pressed by the Court, neither the City nor Deer District have offered any factual or legal support for this remarkable proposition. Because the pedestrian mall is a right-of-way legally and by the City's own admission, the argument that the City lacks authority to grant Verizon's permit applications fails as a matter of law.

Moreover, even if the pedestrian mall were not a right-of-way, the City's (and Deer District's) argument that the City contracted away all authority to grant permits for small wireless facilities in the Plaza is not supported by the terms of the lease. Indeed, the lease contemplates the City retaining rights over the pedestrian mall. While the lease gives WCD "the right . . . to place or install Plaza Improvements on the Premises," that right is not exclusive and is "[s]ubject to compliance with applicable laws and the public transportation and public access rights." (ECF No. 16-3 at 9.) This stands in contrast to other lease provisions. On the next page, WCD is granted "the *exclusive* right to allow commercial vending and similar activities . . . ." (*Id.* at 10) (emphasis added). The difference in language between granting WCD the exclusive right to allow commercial vending as compared to granting it "the right" to install plaza improvements contradicts Deer District's interpretation that the grant with respect to improvements was exclusive and deprived the City from allowing others to install improvements, like small wireless facilities, on the pedestrian mall. *See Parsons v. Associated Banc-Corp.*, 893 N.W.2d 212, 219 (Wis. 2017) ("[W]e must acknowledge a[n] . . . interpretative presumption, namely the intuitive presumption that 'different words have different meanings.'") (quoting Antonin Scalia & Bryan A. Garner, *Reading Law* 170 (2012)).

The Court also agrees with Verizon that the City's authority argument fails for yet another reason. Even if the City had intended to contract away its authority to grant permits in the Plaza, it could not do so consistent with Wisconsin law. Wisconsin law recognizes that state and local governments have certain inherent authorities, or police powers, covering "all matters having a reasonable relation to the protection of public health, safety, or welfare." *State v. Cole*, 665 N.W.2d 328, 337 (Wis. 2003) (quoting *State ex rel. Carnation Milk Prods. Co. v. Emery*, 189 N.W. 564, 567 (Wis. 1922)). Those cannot be contracted away. "A municipality . . . cannot surrender or contract away its governmental functions and powers, and any attempt to surrender them is invalid." *State ex rel. Hammermill Paper Co. v. La Plante*, 205 N.W.2d 784, 811 (Wis. 1973); *see also U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 23–24 (1977) ("[T]he police power and the

power of eminent domain were among those that could not be 'contracted away' . . . ."). State law is clear that the City could not give its inherent powers away to a private entity like Deer District.

At the January 24, 2024 hearing, Deer District insisted the pedestrian mall was not a right-of-way. (ECF No. 40 at 52:14–23.) Deer District reiterated that the TCA left the states the ability to regulate the placement of personal wireless service facilities, and Section 66.0414(1)(t) does not define rights-of-way as including pedestrian malls. (*Id.* at 115:4–22; *see also* ECF No. 25-1 at 2–3.) This argument disregards the century-old definition of a right-of-way, the statute's inclusion of "or other similar property," and is completely unsupported by legal authority to the contrary. Even if Section 66.0414(1)(t) did exclude pedestrian malls as rights-of-way—which it did not—the lease between the City and WCD was written and signed in 2016, three years prior to the adoption of Section 66.0414. Deer District's argument that the lease only acknowledges the pedestrian mall as a public right-of-way with regard to utility access further disregards the fact that utility placement is typically the main concern regarding rights-of-way.

## II.     The City's Permit Denials Also Run Afoul of State Law.

As discussed above, Wisconsin regulates wireless providers' activities in rights-of-way. Wis. Stat. § 66.0414(2). State law mandates localities to provide wireless providers access to rights-of-way. Specifically,

> a wireless provider shall have the right to collocate small wireless facilities and construct, modify, maintain, and replace its own utility poles, or, within the permission of the owner, a 3rd party's utility pole, that supports small wireless facilities along, across, upon, and under a right-of-way.

§ 66.0414(2)(e)1. The statute provides that localities "*shall approve* a permit application *unless* it does not meet the applicable codes, sub. (2)(e)1., or the standards of an ordinance enacted pursuant to sub. (2)(e)1." § 66.0414(3)(c)1.h. (emphasis added). Subsection (2)(e)1. explains that small wireless facilities and utility poles "may not obstruct or hinder travel, drainage, maintenance, or the public health, safety, and general welfare on or around the right-of-way . . . ." § 66.0414(2)(e)1. Local governments may also adopt aesthetic requirements for small wireless facilities if they are (1) reasonable, (2) no more burdensome than those applied to other types of infrastructure deployments, and (3) objective and published in advance. § 66.0414(2)(g), (3)(c)(4); *see also Accelerating Wireless*, 33 FCC Rcd. at 9132. A municipality's decision to deny a permit must be premised on a correct theory of law, reasonable and non-arbitrary actions, and on evidence "such that it might reasonably make the order or determination in question." *See Nowell v. City of*

*Wausau*, 838 N.W.2d 852, 857 (Wis. 2013) (quoting *State ex rel. Brookside Poultry Farms, Inc. v. Jefferson Cnty. Bd. Of Adjustment*, 388 N.W.2d 593, 600–01 (Wis. 1986)).

The City has not provided *any* evidence showing that the permit applications failed to meet any of the applicable codes or ordinance standards. Its October 26, 2023 denials do not cite to any such codes or standards. The statutory language makes plain that the City must approve a permit application unless the small wireless facility will obstruct travel; impede public health, safety, or general welfare; or fails to comport with reasonable, nonburdensome, and objective aesthetic requirements. While the City's "Vetting Process" handout includes aesthetic requirements for carriers interested in small cell deployment, (*see* ECF No. 18 ¶6; ECF No. 18-1), the City has not provided any evidence that Verizon's proposed small cells and poles fail to meet those standards. And, as noted in the discussion of federal law above, while the proximity of poles to one another could, theoretically, obstruct or hinder travel, the City has not pointed to any evidence for that inference beyond clumsy rhetoric at oral argument. Suggestions of inferences the Court could make is not enough to constitute a non-arbitrary decision based on sufficient evidence. Therefore, the permit denials fail as a matter of state law, too.

**III.    Verizon Is Entitled to the Relief It Seeks.**

The TCA directs courts to decide cases arising under Section 332(c)(7) "on an expedited basis," but it does not provide a specific remedy for violations. § 332(c)(7)(B)(v). Most courts, including this one, have held that the appropriate remedy is to order the municipality to issue the denied permit. *See PrimeCo*, 242 F. Supp. 2d at 582 *aff'd on other grounds*, 352 F.3d 1147; *Cellular Tel. Co.*, 166 F.3d at 497 (collecting cases); *Nextel Partners, Inc. v. Kingston Township*, 286 F.3d 687, 695 n.6 (3d Cir. 2002) (collecting cases).

Federal Rule of Civil Procedure 65(a)(2) allows a court to expedite a decision on the merits, so long as the parties receive clear and unambiguous notice of the court's intent to consolidate the preliminary injunction hearing and a trial on the merits. *See Univ. of Texas v. Camenisch*, 451 U.S. 390, 395 (1981) (citing *Pughsley v. 3750 Lake Shore Drive Coop. Bldg.*, 463 F.2d 1055, 1057 (7th Cir. 1972)). The Court here notified the parties of its intent to do so and all parties consented. (*See* ECF Nos. 21 & 35.) Permanent injunctive relief is appropriate where the party seeking the injunction demonstrates irreparable harm, legal remedies are inadequate to compensate for that injury, a balance of the hardships warrant an equitable remedy, and the public interest would not

be disserved by a permanent injunction. *LAJIM, LLC v. Gen. Elec. Co.*, 917 F.3d 933, 944 (7th Cir. 2019) (citing *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006)).

This Court will follow the approach used by Judge Adelman and affirmed by the Seventh Circuit in *PrimeCo*. It will order the City to issue Verizon the six denied permits. Verizon has demonstrated it would suffer irreparable reputational harm if unable to provide appropriate connectivity during the RNC. The public interest would not be disserved by a permanent injunction; indeed, proper connectivity would clearly benefit consumers. Finally, the City's conduct in this case suggests gamesmanship and backroom dealing to benefit a private entity, Deer District. Verizon is therefore entitled to equitable relief. The City is ordered to provide Verizon the permits it has denied within seven days.

## CONCLUSION

Because the Court is granting Verizon relief on the merits, it will also deny Deer District's motion to dismiss.

Accordingly,

**IT IS HEREBY ORDERED** that the City of Milwaukee must issue Verizon the six permit applications it previously denied within seven days of the date of this order.

**IT IS FURTHER ORDERED** that Verizon's motion for preliminary injunction, ECF No. 4, is **DENIED as moot**.

**IT IS FURTHER ORDERED** that Deer District's motion to dismiss, ECF No. 38, is **DENIED**.

Dated at Milwaukee, Wisconsin on January 29, 2024.

s/ *Brett H. Ludwig*
BRETT H. LUDWIG
United States District Judge